UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

                             Case No. 99-CR-211

        vs.

YOGESH SHAH,

        Defendant.

## GOVERNMENT'S TRIAL MEMORANDUM

### A.    Background

Defendant Yogesh Shah was the sole defendant charged in a seven-count Indictment returned by the grand jury on December 7, 1999. Counts One through Five related to a scheme to defraud "investors, lenders and others engaged in business transactions with 1043 Development Corporation and associated businesses." In particular, Counts One and Five charged bank fraud, in violation of Title 18, United States Code, sections 1344 and 2. Counts Two and Three charged wire fraud, in violation of Title 18, United States Code, sections 1343 and 2. Count Four charged interstate travel in furtherance of a scheme to defraud, in violation of Title 18, United States Code, sections 2314 and 2. Finally, Counts Six and Seven charged money laundering, in violation of Title 18, United States Code, sections 2 and 1956.

The defendant was arraigned December 21, 1999, and entered not guilty pleas to all counts.

In order to apprise the Court of the legal and factual matters involved in this case, the United States submits the following.

## B.   The Scheme to Defraud

### 1.   Legal Standards

The first five counts relate to a scheme to defraud. A scheme is a course of conduct intended to deceive another in order to obtain something of value. *See* Federal Criminal Jury Instructions of the Seventh Circuit, Vol. II, p. 90; *United States v. Moede*, 48 F.3d 238, 241 (7th Cir. 1995). A scheme to defraud is conduct that demonstrates "a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *United States v. Hammen,* 977 F.2d 379, 383 (7th Cir. 1994) quoting *United States v. Goldblatt,* 813 F.2d 619, 624 (3rd Cir. 1987). To act with "an intent to defraud" means to act knowingly and with the intention or purpose to deceive or cheat in order to cause the loss of money or a financial gain. *Id.;* Jury Instructions, p. 91.

A scheme to defraud may be defined in an indictment through one or more acts of deception, but only one such deceptive act need be proven in order to establish the existence of the scheme to defraud. *2 Federal Criminal Jury Instructions of the Seventh Circuit 90; Hammen*, 977 F.2d at 383. Although the bank fraud and wire fraud statutes do not contain an explicit requirement that the deception be material, the Supreme Court recently held that materiality was present in all common law definitions of fraud and was incorporated into Congress' drafting of the statute. *United States v. Neder*, 118 S. Ct. 1827 (1999). Materiality is present if the deception has a natural tendency or is capable of

2

influencing the decision of the person to whom the deception was addressed. *See United States v. Guadin*, 515 U.S. 506, 509 (1995).

## 2.    Indictment Allegations

In the case at hand, the Indictment alleges that the purpose of the scheme to defraud was "to obtain funds through false and fraudulent pretenses, representations and promises regarding (a) the financial condition of 1043 Development Corporation and associated businesses; (b) the circumstances of financial transactions; and (c) security pledged to obtain financing." The Indictment further alleges that as part of the scheme to defraud, Shah and others acting under his direction:

      a.    forged signatures;

      b.    falsified documents;

      c.    incurred financial obligations without proper consent;

      d.    transferred real estate without proper consent; and

      e.    embezzled insurance proceeds.

## 3.    1043 Development Corporation

In the 1980s, Yogesh Shah operated the popular El Sombrero restaurant in Milwaukee. In 1989, however, he and the company went bankrupt. Thereafter, Shah entered the real estate business, first as a mortgage broker and then as a developer. In this latter capacity, he arranged for the construction of houses and development of subdivisions. The properties were located throughout Southeastern Wisconsin, including Fredonia, Pewaukee, Oak Creek, and Kenosha. Although Shah operated under a variety of corporate names, 1043 Development Corporation was his primary business.

3

Because of his prior financial problems, though, Shah did not put his own name directly on any of his businesses. Mary Ramirez, a former waitress at El Sombrero, was the nominal president of each of the companies. She also was the primary signatory on all checks issued by 1043 Development and the other corporations. Ramirez, however, took all direction from Shah.

### 4. Shah's Investment Plan

In order to run his business, Shah obtained money from two main sources: investors and lenders. Each were pitched with the same business plan. Shah would build and sell homes under a "rent-to-own" plan that he contended would earn double-digit profits. For each house to be built, an investor would put up 25 to 30 percent of the construction costs and financial institutions would fund the remaining percentage. The financial institutions would receive a first mortgage on the property and the investor would receive a second, guaranteeing the money provided by each. In some instances, the investor obtained the funds through a second mortgage.

A tenant would sign a "rent-to-own" agreement under which he or she would pay $5,000; lease the premises for a two-year period; and then obtain purchase financing. This setup would provide 1043 Development with an income flow to pay the interest on the loans and investments. It also gave the tenant the opportunity to build his or her credit before obtaining purchase financing for the house.

The investors came from three main groups: (a) local investors who knew each other through basketball at a YMCA; (b) medical professionals and associates from New Jersey who were introduced to Shah through religious connections; and (c) Illinois

4

residents whose investments were solicited by a Shah associate named Devon Joshi. The total amount invested was approximately $20.8 million. In most instances, Shah promised returns in excess of 20 percent, to be paid in monthly installments.

The lenders were a variety of financial institutions that provided either construction financing and/or purchase financing. [The purchase financing would repay the construction loans and use the completed house as security.] Local banks providing loans to Shah's businesses included M&I, Community Bank of Grafton, and North Shore Bank. During the time period of the Indictment, the primary out-of-state lender was IndyMac of Irvine, California.

### 5.    **Fraudulent Activities**

By April of 1998, Shah's investment plan was revealing itself as flawed. There simply was not enough money to pay all the creditors, investors, and lenders that had been promised money. In addition, Shah was systematically draining funds from the company for his own use. For example, he leased 12 vehicles, six of which were used by Shah and family members. Corporate funds also were used for alimony payments, tuition, vacations, and expensive clothing. During one 12-month time period of the Indictment, Shah took more than $300,000 from the corporation without indicating the funds as personal income.

In order to keep a flow of funds coming, however, Shah turned to fraud:

Shah intentionally misrepresented financial transactions in order to receive additional loan proceeds. For example, under Count One, when borrowing $2 million in construction funds from TCF Bank, Shah was allowed to draw additional funds by

5

representing that a particular home had been sold. Because of his need for additional cash, Shah directed his employees to create false documents showing that a home had been sold, when in fact it had not been. On another instance, an empty lot was represented as a completed transaction. These types of actions went undisclosed until Shah defaulted on three of his TCF loans, causing losses in excess of $200,000.

Shah then repeated the activity with respect to IndyMac, conduct which constitutes Counts Two and Three of the Indictment. IndyMac had conditionally provided a $20 million line of credit that was used, in part, to pay off M&I Bank when a condominium was sold. Again, Shah was allowed to draw these funds only upon proof that a condominium had been leased under the rent-to-own program. As with TCF, Shah had employees falsify leases in order to obtain additional funds. For example, in order to obtain IndyMac funds in January of 1999, Shah represented that Gary Zajc had signed a offer to purchase the condominium at 6935 Rolling Meadows Court in Oak Creek. In fact, Zajc never bought that property.

Also with respect to the IndyMac transactions, Shah obtained the approval for these lines of credit under false pretenses. He represented to IndyMac that the financing would be personally guaranteed by certain New Jersey investors [Doctors Shah, Mankikar and Sehgal] while at the same time telling those investors that they would not have to personally guarantee the new funds. Shah employees were instructed to forge the signatures of the doctors and Shah's accountant made up financial statements for the three based on information Shah had provided.

6

As a further part of the fraud, Shah presented false financial information to investors in order to obtain additional funds. He represented that his company was making large amounts of money, when in fact it was insolvent and he needed to commit fraud in order to keep it going. Shah also misrepresented how the investments were secured. Shah represented that the investor funds were secured by individual pieces of property, when, in fact ,Shah had employees forge signatures in order to transfer second mortgages to new investors, leaving unsuspecting prior investors with no security.

Shah raised additional investor funds by paying cash bribes to Devin Joshi, an Illinois investor advisor, to recruit new investors. One such payment provides the backdrop to Count Four. Joshi was an investment advisor supposedly giving independent investment advice to Illinois residents. Instead, because of the under-the-table payments, Joshi ignored the companies' financial problems and continued to recruit investors for Shah.

Next, Shah forged signatures and embezzled insurance proceeds when one of his homes burned. Community Bank of Grafton had provided the initial financing, with a second mortgage guaranteeing the investments of Michael Sievert and Mary Cosby. When Shah received an insurance check made payable to the mortgage holders, he forged the signatures of Sievert, Cosby and a representative of Community Bank of Grafton, and then deposited the funds in his account at Guaranty Bank.

In sum, Shah's fraud became a Ponzi scheme, whereby a flow of cash was paramount. Shah had obligated 1043 Development to pay almost $350,000 a month in

7

investor interest payments. On top of these obligations was interest payments on the bank loans, which at times was up to another $150,000 a month.

### 6. Bankruptcy

Shah's fraud came to a head with the bankruptcy of 1043 Development Corporation in July of 1999. He declared liabilities of $29 million and assets of $12 million.

Moreover, by putting both assets and liabilities in the names of others, and by putting a nest egg overseas, Shah – through his scheme – was able to avoid any personal liability for his fraud. As discussed below in the money laundering section, Shah engaged in fiancial transactions designed to conceal the location, ownership and control of his ill-gotten gains.

### C. Bank Fraud Counts

### 1. Elements

A bank fraud is a scheme to defraud executed, in part, through the receipt of funds from a federally insured financial institution. *Hammen*, 977 F.2d. at 379; *Moede*, 48 F.3d at 238. In order to prove a bank fraud offense, the government must establish: (a) that the defendant participated in a scheme to defraud; (b) that the fraud contained a material deception; (c) that the scheme was directed, at least in part, at a federally insured financial institution; (d) that the scheme was executed in the manner charged in the indictment; and (e) that the defendant acted knowingly and with intent to defraud. *United States v. Stockheimmer*, 157 F.3d 1082 (7th Cir. 1998); *United States v. LeDonne*, 21 F.3d 1418 (7th Cir. 1994); *Hammen*; *Moede*.

8

2.     **Count One**

Count One alleges that on or about April 22, 1998, Shah executed his scheme to defraud by receiving loan proceeds from TCF National Bank. The evidence will show that on this date, Shah obtained loan proceeds based on representations that a residence at 8550 S. Apple Creek had been leased under the rent-to-own program. In fact, no such sale had taken place.

The receipt of loan proceeds based on the submission of false financial information constitutes a bank fraud offense. *Morris; Hammen.*

3.     **Count Five**

Count Five alleged that on or about October 28, 1998, Shah attempted to execute the scheme to defraud by depositing a $105,809.26 check at Guaranty Bank.[1] The check had been issued by General Casualty of Wisconsin after a home in Shah's English Aire subdivision had burned. The check was made payable to Community Bank of Grafton, Michael Sievert, and Mary Cosby – the three parties whose investments were guaranteed by the real estate that had burned. The check was sent to 1043 Development, where Shah forged the signatures of the parties and deposited the check into the 1043 Development Corporation account. Shah's actions went unnoticed until June of 1999, when he was confronted and repaid the funds.

---

[1] Section 1344 criminalizes "attempts" to execute as well. "To 'attempt' an offense means willfully to do some act, in an effort to bring about or accomplish something the law forbids. *Federal Criminal Jury Instructions of the Seventh Circuit,* section 5.10.

9

Receipt of funds from a bank through the use of forged signatures constitutes a bank fraud offense. *Moede*; *United States v. Howard*, 30 F.3d 871, 874 (7th Cir. 1994); *United States v. Sayan*, 968 F.2d 55, 61 (D.C. Cir. 1992).

## D. Wire Fraud Counts

### 1. Elements

A wire fraud offense is established if the government proves: (a) the defendant participated in a scheme to defraud; (b) the fraud contained a material deception; (c) the defendant caused an interstate wire communication in furtherance of the scheme to defraud; and (d) the defendant acted knowingly and with intent to defraud. *United States v. Lindemann*, 85 F.3d 1232, 1240 (7th Cir. 1996); *United States v. Ross*, 77 F.3d 1525 (7th Cir. 1996).

### 2. Counts Two and Three

The wire fraud offenses of Counts Two and Three allege that the defendant executed the scheme to defraud through two interstate wire communications in January of 1999. Count Two alleges that on January 7, 1999, the defendant caused the interstate transfer of loan proceeds from IndyMac based upon false closing documents from the Rolling Meadows Court condominiums. Count Three makes a similar allegation, only the wire transfer allegedly took place on January 15, 1999.

## E. Interstate Transfer

### 1. Elements

In order to prove a defendant guilty of an offense under Title 18, United States Code, section 2314, the government must prove the following elements: (1) the

10

defendant participated in a scheme to defraud; (2) the scheme involved a material deception; (3) the victims of the scheme lost at least $5,000; and (4) in execution of the scheme, the scheme caused a victim to travel in interstate commerce. *United States v. Myerson*, 18 F.3d 153, 164 (2d Cir. 1994); *see also United States v. Gooch*, 120 F.3d, 78, 80 (7th Cir. 1997).

## 2. Count Four

The Indictment alleges that Shah induced a courier (Greg Mallum) to travel in interstate commerce in furtherance of the scheme. Before doing so, Mallum was given checks written out to him as business checks. Instead of being legitimate income, the checks were a cover for cash bribes that Shah was paying to Devon Joshi, the Illinois investment advisor. Joshi then recruited investors in that state for Shah and 1043 Development.

## F. Money Laundering

### 1. Legal Standards

In Counts Six and Seven, the indictment alleges that Shah engaged in money laundering transactions designed to conceal the location, ownership and control of the proceeds of wire and bank fraud. *Cf: United States v. Brown*, 3 F.3d 484 (7th Cir. 1994) (conduct constituting bank fraud and money laundering). The government's theory is that Shah systematically drained money from 1043 Development in order to enjoy the fruits of his offense with none of the corresponding liability. The transactions at issue (wire transfers to India) put proceeds of the 1043 Development fraud into Shah's personal

11

control in a foreign country, so that the investors and creditors of 1043 Development could not reach it if the scheme unraveled.

The elements of a section 1956 offense are as follows: (1) the defendant knowingly conducted a financial transaction; (2) the funds involved in the transaction were proceeds of a specified unlawful activity; (3) the defendant knew the funds had come from some unlawful activity; and (4) the defendant engaged in the transaction with the intent to conceal the nature, location, source, ownership, or control of the proceeds. 7th Circuit Pattern Jury Instructions, pp. 256-261 (1998).

A "financial transaction" under the statute includes the wire transfer of money from a bank, provided that either the transaction or the bank's activities have at least a minimal impact on interstate commerce. *See* section 1956(c)(4); *United States v. Laurenzana,* 113 F.3d 689, 692-93 (7th Cir. 1997); *see also United States v. Mankarious,* 151 F.3d 694, 701 (7th Cir. 1998) (cashing of proceeds checks); and *United States v. Adams,* 74 F.3d 1093, 1100 (11th Cir. 1996) (purchase of cashier's checks to promote fraud against RTC).

The "concealment" conduct need not be total and complete in order to violate a statute. *United States v. Tencer,* 107 F.3d 1120, 1129 (5th Cir. 1997). It is enough that some aspect of the proceeds is concealed. *Id.* For example, the systematic movement of illegal funds in a foreign country violates section 1956. *Tencer; United States v. Massac,* 867 F.2d 174, 178 (3d Cir. 1989), even if the funds may have stayed in the defendant's own name. *Tencer.*

12

### 2.    Counts Six and Seven

As stated above, Yogesh Shah took more than $300,000 from his corporations in one twelve-month period. He did so in a manner that avoided any disclosure of personal benefit from the transactions. He further engaged in systematic wire transfers of such funds to India. By doing so, Shah enjoyed the fruits of his offense in a manner that concealed his location, ownership, and control of such proceeds. When the scheme was disclosed, the funds simply were not available to the victims of the 1043 Development fraud and Shah himself claimed no personal responsibility. Count Six concerns an $11,000 wire transfer to India on or about October 28, 1998; Count Seven alleged a similar transaction for $10,000 on or about March 1, 1999.

### G.    Title 18, United States Code, Section 2

All the counts of the Indictment allege that the defendant, in committing his offenses, also violated Title 18, United States Code, section 2. That statute reads, in part: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principle." As such, the government need not prove that Shah himself engaged in every false statement or forgery; it is enough if the jury finds that Shah "willfully ordered, directed or authorized" the acts in question. *Federal Criminal Jury Instructions of the Seventh Circuit, sections 5.05, 5.06; United States v. Sheridan* 329 U.S. 379, 391 (1947) ("One who induces another to do exactly what he intends, and does so by defrauding him, hardly can be held not to 'cause' what is done.)

13

## H.    Witnesses

The United States expects to call the following persons as part of its case-in-chief.  Not included are records custodians, who will be called if needed to verify the authenticity of records.

1.    Mary Rameriz, former president of 1043 Development

2.    Kathleen Wacker, TCF National Bank

3.    Victoria Johnson, real estate broker for Creative Mortgage

4.    Nalanie Kumar, former employee of 1043 Development

5.    Walter Tharp, IndyMac

6.    Richard Berka, former sales manager for 1043 Development

7.    Gary Zajc, resident of Rolling Meadows condominiums

8.    James Fraser, IndyMac

9.    Cynthia Paonessa, Charter Title

10.    Dr. Durgesh Mankikar, investor

11.    Dr. Gautam Sehgal, investor

12.    Lori Barnett, former employee of 1043 Development

13.    Dr. Mirza G. Jesani, investor

14.    Greg Mallum, former employee of 1043 Development

15.    Michael Sievert, investor

16.    Mary Crosby, investor

17.    Robert E. Farree, Community Bank of Grafton

18.    Marion Glinberg/Fred C. Krenske, Guaranty Bank

14

19.     Richard Kastenmeir, investor

20.     Terry Rice, accountant

21.     Terry Sparacino, Federal Bureau of Investigation

Dated this 15th day of February, 2000.

Respectfully submitted,

THOMAS P. SCHNEIDER
United States Attorney

By:     *Steven M. Biskupic*

STEVEN M. BISKUPIC
Assistant United States Attorney

15